COLUMBUS BAR ASSOCIATION *v.* COOKE.

[Cite as *Columbus Bar Assn. v. Cooke,*
111 Ohio St.3d 290, 2006-Ohio-5709.]

(No. 2006–1241—Submitted August 8, 2006—Decided November 15, 2006.)

---

**Per Curiam.**

{¶ 1} Respondent, Reginald Alpha Cooke of Columbus, Ohio, Attorney Registration No. 0031031, was admitted to the Ohio bar in 1984.

{¶ 2} In September 2005, relator, Columbus Bar Association, filed an amended complaint charging respondent with professional misconduct. Respondent filed an answer to the complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a four-day hearing on the complaint in January, February, and March 2006. The panel then prepared written findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

## Misconduct

### *Count I*

{¶ 3} In November 2001, Cheryl Ragland hired respondent to assist her with a personal bankruptcy matter, and she paid him $800 for his services. From her discussions with respondent, Ragland believed that her request to file bankruptcy would be heard by a court and would be resolved in December 2001. She called respondent several times in the weeks following their initial meeting, and he assured her that her case was proceeding smoothly. Respondent did not in fact file a bankruptcy petition on Ragland's behalf until April 2002.

{¶ 4} Ragland was involved in a car accident in February 2002. The following month, she signed a contingent-fee contract with respondent authorizing him to represent her in a personal-injury suit against the driver of the car that had struck hers.

{¶ 5} The bankruptcy petition and accompanying paperwork that respondent filed on Ragland's behalf in April 2002 contained factual errors and did not indicate that Ragland intended to pursue a personal-injury claim related to the car accident. Bankruptcy attorney Pamela Maggied testified as an expert witness at respondent's disciplinary hearing, and she explained that full disclosure of a debtor's assets is "critical" in bankruptcy cases. In Maggied's expert opinion, respondent should have listed Ragland's potential personal-injury claim arising out of the February 2002 car accident when respondent filed a list of Ragland's assets with the bankruptcy court in April 2002.

{¶ 6} At a creditors' meeting with the bankruptcy trustee on May 9, 2002, the trustee asked Ragland if she stood to benefit from any insurance claims or

pending lawsuits. Ragland said no. That statement was inaccurate, and although respondent was present, he did not attempt to correct it.

{¶ 7} In June 2002, respondent asked Ragland's car insurance provider, State Farm, to compensate Ragland for the medical expenses and the pain and suffering that she had sustained as a result of the February car accident. In August 2002, State Farm agreed to pay Ragland $17,500 under the uninsured-motorist provision of her insurance policy.

{¶ 8} According to attorney Maggied's expert testimony at respondent's disciplinary hearing, respondent had no authority to represent Ragland in connection with the personal-injury claim once Ragland's bankruptcy petition was filed in April 2002. Instead, the authority to choose an attorney to handle the claim belonged exclusively to the bankruptcy trustee.

{¶ 9} While Ragland's bankruptcy case was pending, respondent did not tell the bankruptcy trustee or the bankruptcy court about Ragland's car accident, about his demand to State Farm, or about State Farm's $17,500 payment to Ragland. Ragland's debts were discharged by the bankruptcy court in September 2002. When the bankruptcy trustee learned about the insurance settlement that respondent had secured for Ragland, however, the trustee filed an adversary proceeding against respondent and Ragland in the bankruptcy court, asking that the settlement proceeds be paid to Ragland's bankruptcy estate.

{¶ 10} In a June 2003 letter to the bankruptcy trustee, respondent described the $17,500 payment to Ragland from State Farm as a "post-petition wage loss settlement," even though the accident occurred before Ragland's bankruptcy petition was filed and a State Farm agent had explained to respondent in August 2002 that the amount of the State Farm settlement attributable to Ragland's lost wages was negligible.

{¶ 11} At his disciplinary hearing, respondent testified that he did not list Ragland's potential personal-injury suit on the schedules that he filed with her bankruptcy petition in April 2002 because he thought that she was not being truthful about her alleged injuries resulting from the car accident. He nonetheless sought and accepted the financial settlement on Ragland's behalf from State Farm in the summer of 2002 for those injuries.

{¶ 12} Respondent's fee agreement with Ragland for her bankruptcy case set a flat fee of $800 for his services and also provided that "additional fees shall be required if this matter develops into a contested trial or hearing." On November 29, 2002, respondent sent Ragland a bill for a $200 bankruptcy filing fee and for 25.3 hours of work on the bankruptcy case at a rate of $150 per hour. The bill noted that respondent had applied the initial $800 payment toward the total fee, and respondent asked Ragland to pay the balance of $3,195, explaining in a letter that her case "was a contested matter that required additional time."

{¶ 13} At respondent's disciplinary hearing, Ragland testified that she was "shocked" when the bill arrived because respondent had never discussed additional bankruptcy charges with her and had never told her at any time that her bankruptcy proceedings had become "contested." Attorney Maggied testified that much of respondent's work on the bankruptcy case would not have been necessary had respondent properly disclosed all of Ragland's assets to the bankruptcy court.

{¶ 14} Respondent acknowledged that his client trust account carried a negative balance at various times in 2002 and 2003. He also sometimes used that account as an operating account for his law practice.

{¶ 15} Respondent did not maintain legal-malpractice insurance coverage during part of the time that he represented Ragland, and he did not disclose that information to her.

{¶ 16} After examining respondent's actions, the board found that respondent had violated the following Disciplinary Rules: DR 1–102(A)(4) (barring conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (barring conduct prejudicial to the administration of justice), 1–102(A)(6) (barring conduct that adversely reflects on a lawyer's fitness to practice law), 1–104 (requiring an attorney who does not maintain adequate professional-liability insurance to so advise his or her clients in writing), 2–106(A) (prohibiting a lawyer from charging a clearly excessive fee), 6–101(A)(1) (prohibiting a lawyer from accepting a case that the lawyer is not competent to handle), 7–101(A)(3) (barring an attorney from intentionally prejudicing or damaging a client during the course of the professional relationship), 7–102(A)(2) (barring an attorney from knowingly advancing a claim or defense that is unwarranted under existing law), 7–102(A)(3) (prohibiting a lawyer from failing to disclose what he is required by law to reveal), 7–102(A)(4) (barring a lawyer from knowingly using false evidence or perjured testimony), 7–102(A)(5) (prohibiting an attorney from knowingly making a false statement of fact), and 9–102(A) (requiring a lawyer to maintain client funds in a separate, identifiable bank account).

### Count II

{¶ 17} Respondent did not maintain legal-malpractice insurance coverage while representing his client Joshua Patterson, and respondent did not disclose that information to Patterson.

{¶ 18} The board found that respondent had violated DR 1–104.

### Count III

{¶ 19} In August 2002, Ragland signed a settlement-distribution authorization form prepared by respondent for the $17,500 car-accident insurance payment

from State Farm. That form called for the payment of $3,000 to the bankruptcy trustee, $4,280 to Ragland's physician, and $10,220 to Ragland herself.

{¶ 20} In his response to Ragland's grievance concerning his fees, however, respondent told relator in March 2003 that Ragland had approved and that he had made the following distribution of the settlement proceeds: $5,400 to the bankruptcy trustee, $4,280 to Ragland's physician, $4,250 to Ragland, and $3,195 to respondent himself for his services on the bankruptcy case.

{¶ 21} Then in June 2003, respondent sent a letter to the bankruptcy trustee representing to her that the funds had been distributed as follows: $5,400 to the trustee, $4,000 to Ragland, $5,827.50 to respondent as a legal fee paid on a contingency basis, and an additional $2,272.50 as a legal fee for his services on Ragland's bankruptcy case.

{¶ 22} Ragland testified at respondent's disciplinary hearing that she had not received the amounts that respondent claimed. She testified that after the $17,500 settlement was paid by State Farm, respondent told her that she could not have the money "because of the bankruptcy." She eventually received $4,250 from respondent as a result of the settlement with State Farm, but she had expected to receive two-thirds of the $17,500 payment.

{¶ 23} Respondent testified at his disciplinary hearing that he decided to take a contingent fee from the settlement proceeds after Ragland filed a grievance against him in February 2003. At that hearing, he also admitted that he had never paid any of the settlement proceeds to Ragland's physician, whose bills had been paid directly by State Farm in August 2002.

{¶ 24} Although respondent deposited the $17,500 settlement check from State Farm in his client trust account on August 22, 2002, the balance in that account fell to $153.01 by October 7, 2002. On that latter date, respondent still owed Ragland some of the settlement proceeds, and he had not yet told her that he intended to charge her additional bankruptcy fees beyond the initial $800 fee, nor had he told her that he intended to pay himself a contingency fee from the settlement proceeds.

{¶ 25} An accountant who testified at respondent's disciplinary hearing stated that the records respondent maintained for his client trust account did not indicate the names of the clients whose funds were in the account or the amount of each client's funds in that account. Respondent also wrote checks to himself from the client trust account without noting which client's funds were being withdrawn or why.

{¶ 26} The board found that respondent had violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 9–102(A), and 9–102(B)(3) (requiring a lawyer to maintain complete records and render appropriate accounts of a client's property).

## Sanction

{¶ 27} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As aggravating factors, the board found that respondent had acted with a dishonest and selfish motive, engaged in a pattern of misconduct, committed multiple offenses, gave false statements during relator's investigation, refused to acknowledge the wrongful nature of his actions, caused harm to a vulnerable victim, and failed to make restitution. BCGD Proc.Reg. 10(B)(1)(b), (c), (d), (f), (g), (h), and (i). The sole mitigating factor cited by the board was respondent's lack of any prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a).

{¶ 28} The board cited respondent's dishonesty as the most troubling aspect of the case. According to the board, respondent "lacks the basic ability to distinguish truth, especially when it does not serve his personal interests." He attempted, the board found, to keep as much of Ragland's personal-injury settlement as he could, and he issued a bill to Ragland for additional bankruptcy fees as "a pretext to conceal that he had already converted" the settlement proceeds for his own use. The board described respondent's actions before the bankruptcy court as "fraudulent and deceitful," and it concluded that he had lied to his client about his actions and her funds, lied to relator during the disciplinary investigation, and lied to the panel during its four-day hearing into his actions.

{¶ 29} Relator recommended that respondent's license to practice law be indefinitely suspended. The panel and the board issued similar recommendations.

{¶ 30} We have reviewed the board's report, and we find that respondent violated all of the provisions as described above. We also agree with the board that the appropriate sanction in this case is an indefinite suspension.

{¶ 31} After four days of hearings on respondent's misconduct, the panel was certainly in a good position to evaluate his credibility and the likelihood that he can serve his clients competently and ethically in the future. We give considerable credence to the panel's and the board's conclusions that respondent was dishonest "throughout these proceedings" and that he displayed a "cavalier approach" to the management of his client trust account. We also appreciate the panel's thorough analysis of this complex case and agree with its assessment that an indefinite suspension "is the only means to protect the public."

{¶ 32} Many of respondent's ethical lapses are very serious in and of themselves. Collectively, they justify the sanction that the board has recommended. There is simply no place in the legal profession for those who are unwilling or unable to be honest with clients, the courts, and their colleagues. Respondent's

misrepresentations to the bankruptcy court, to his client, to relator during the disciplinary investigation, and to the panel during the hearing compel an actual suspension from the practice of law. His assertion at the hearing that he is "proud" of his "aggressive" work on Ragland's behalf shows his lack of integrity. The one mitigating factor in this case pales in comparison to the many aggravating factors, and an indefinite suspension is appropriate in light of respondent's dishonesty, his mismanagement of his client trust account, and his attempt to charge an excessive fee to his client.

{¶ 33} We have imposed indefinite suspensions in similar cases. See, e.g., *Disciplinary Counsel v. Wise*, 108 Ohio St.3d 381, 2006-Ohio-1194, 843 N.E.2d 1198, ¶ 15 (explaining that the mishandling of clients' funds is a matter of the gravest concern whether or not the client has been harmed); *Cuyahoga Cty. Bar Assn. v. Kelley*, 105 Ohio St.3d 55, 2004-Ohio-7009, 822 N.E.2d 351 (attorney failed to apprise the bankruptcy court of some of his client's assets, failed to maintain malpractice insurance, and mishandled the proceeds from a client's personal-injury settlement); *Disciplinary Counsel v. Trumbo* (1996), 76 Ohio St.3d 369, 373, 667 N.E.2d 1186 (attorney's pattern of "continually lying to her clients, lying to the court, and lying to Disciplinary Counsel" showed that she was not fit to enjoy the privilege of practicing law in Ohio).

{¶ 34} Accordingly, respondent is hereby indefinitely suspended from the practice of law in Ohio. As a prerequisite to the filing of any petition for reinstatement, respondent must prove that (1) he has satisfied any obligations imposed on him in the pending adversary proceeding filed by the bankruptcy trustee, (2) he has reimbursed Ragland for any legal expenses that she has incurred or may incur to defend herself in the adversary proceeding, and (3) he has reimbursed Ragland for any money that she may be forced to pay to the bankruptcy estate in the adversary proceeding. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., not participating.

---

Porter Wright Morris & Arthur, L.L.P., and James P. Botti; Judith M. McInturff; Bruce M. Campbell; and A. Alysha Clous, for relator.

Moore & Yaklevich and John A. Yaklevich, for respondent.